Hawkins, J.,
delivered the opinion of the Court.
This suit was instituted by Gholson, Administrator of Rogers, against Blackman, before a Justice of the Peace for the County of Montgomery, on the 27th of November, 1865. The Justice before whom the cause • was tried, rendered a judgment in favor of the plaintiff, for the sum of $58.33, and costs; from which the defendant appealed to the Circuit Court of Montgomery County, in which a trial was had, resulting in a verdict and judgment in favor of the defendant. The plaintiff moved for a new trial, which being overruled, he has prosecuted an appeal in error to this Court.
Upon the trial in the Circuit Court, the case was submitted to the jury upon an agreed state of facts, from which it appears that Gholson, as the administrator of the estate of A. M. Rogers, deceased, hired a woman slave, named Ellen, to Blackman, for the years 1860, 1861, 1862 and 1863. Said woman, Ellen, and her son, Charles, continued in the service and employ of Blackman from 1863 up to the 22d of February, 1865.
The military forces of the United States occupied the town of Clarksville as a military post during the year 1864, and up to the 22d of February, 1865; during the whole of which time, Blackman lived within the lines of said post. During this period, a great many slaves came within the lines, and did as they pleased, so far as their masters were concerned. No master could control his slave. They hired themselves to whom they pleased, and received the hire. Many of the citi *582 zens of Clarksville were compelled to hire these negroes or do without servants, and it was their common practice to hire any negro they wanted, who would consent to live with them. Blackman' paid Grholson for the hire up to 1864, and this suit is brought to recover the hire for the year 1864, and up to the 22d of February, 1865.
At the first of the year 1864, the husband of the woman, Ellen, notified Blackman that he must not pay Grholson any further for her hire, and that from that time the wages must be paid to her; and accordingly, Blackman paid the woman her hire for the years 1864 and 1865.
Grholson, the administrator, was at one time in the rebel army. So, also, was one of the heirs of the intestate Rogers; but there were other heirs of the intestate who were infants, and had no participation in the rebellion.
Under this general state of facts, His Honor, the Circuit Judge, instructed the jury: “If the facts of the case are, that the defendant paid the hire to the negro, under the circumstances enumerated, you will find for. the defendant. If on the contrary, you will find for the plaintiff.”
We think this instruction was erroneous. There can certainly be no question, but that as the law stood prior to the breaking out of the recent rebellion, the plaintiff would have been entitled to recover of the defendant the hire of said slaves whilst they remained in his service and employ, without any express stipulation on the part of the defendant to pay the same; *583 and it is equally clear that a payment to the slave would not have discharged the liability of the defendant on account of the hire. The question then arises, have the rules of law, by which the rights and liabilities of the parties would have been as stated, been changed or abrogated? and, if so, when and how?
It is insisted in argument, that inasmuch as Gholson, the administrator, and one of the heirs of the intestate Rogers, were once in the rebel army, and said slaves were within the town of Clarksville while it was oocupied by the military forces of the United States; therefore, under the provisions of the Act of Congress, approved March 13, 1862, entitled “An Act to make an additional Article of War,” and of the Act approved July 17, 1862, entitled “An Act to suppress insurrection, etc.,” said slaves were captives of war, and became free prior to the hiring in 1864.
Let us, then, examine these acts of Congress, and see if this proposition can be maintained. The Act of the 13th March, 1862, vol. 12, United States Statutes at large, 354, does nothing more than to prohibit officers or persons in the military or naval service of the United States, from employing any of the forces under their respective commands, for the purpose of returning fugitives from service or labor, who may have escaped from any persons to whom such service or labor is claimed to be due.
This is only an additional article of war, and was only designed to govern the conduct of those who were in the military or naval service of the United States, *584 and did not, in any manner, affect tbe rights of property, or liabilities of others.
The provisions of the Act of July 17th, 1862, relied upon, are incorporated in the 9th section of the Act, and are as follows: “That all slaves of persons who shall hereafter be engaged in rebellion against the government of the United States, or who shall, in any way, give aid or comfort thereto, escaping from such persons, and taking refuge within the lines of the army; and all slaves captured from such persons, or deserted by them, and coming under the control of the government of the United States; and all slaves of such persons found on, or being within any place occupied by the Rebel forces, and afterwards occupied by the forces of the United States, shall be deemed captives of war, and shall be forever free of their servitude, and not again held as slaves:” Vol. 12, United States Statutes at large, 591. It has likewise been insisted in argument; first, that both these Acts of Congress are unconstitutional; second, that the act of the administrator in engaging in a rebellion could not, in. any manner, affect the property belonging to the estate o'f his intestate; third, that one of several heirs, or distributees, could not, by engaging in the rebellion, thereby prejudice the rights of others.
We will not now stop to discuss those several prop- • ositions, or to express any opinion touching them, because they do not properly arise in the cause, and their decision is not necessary to an adjudication of the rights of the parties. It is sufficient to say, it does not ap *585 pear from the facts presented by this record,' that any person to whom said slaves belonged, or who has any interest in them, has, since the passage of the Act of July 17th, 1862, engaged in any rebellion against the government of the United States, or in any way given aid and comfort thereto; consequently, the provisions of the statute do not apply; neither the status of these slaves, or the rights or liabilities of the parties, are in any manner affected by it.
But the instructions of his Honor to the jury, seems to have been based upon entirely different grounds from those relied upon in this Court. Among other things, he said to the jury:
' “In ruling the law in this case, the Court cannot overlook the fact, that on the - day of —:-, 186 — , the President of the United States issued a proclamation, declaring the negro free. This proclamation, at the time, was backed up by a strong and efficient military power, both upon land and sea, which certainly increased up to the termination of the war.
“It affected the independence of individuals; tended to overthrow institutions and conventionalisms; States, for the time being, shorn of their prerogatives; all became subordinated to this power, and as a necessary and inevitable consequence, the relation of master and slave, pending the latter years of the war, was, in point of fact, suspended; which terminated by consent of master and States into an absolute and fixed change, going, in fact, to the extreme of making the negro’s legal status a freeman. So it is, that after the relation of master *586 and slave Vas suspended, or deranged, the masters, as a class, never recovered their control and authority over the slave; hut in the end, by the national will and decree, lost it forever. This revolution, although rapid, was regular; and, perhaps, in point of fact, the emancipation of slavery by the States, was only a ratification of the proclamation of emancipation, or putting the ‘seal to the deed.’ ”
It is not necessary that we enter fully into a discussion of the principles stated by his Honor, in this portion of his instructions to the jury; for, as we conceive, they are based upon an erroneous assumption of fact, and consequently have no application whatever to the case under consideration. They seem to have been based upon the belief of the fact that the President of the United States had, at some time, issued a proclamation, declaring all slaves in the United States free, when, in fact, no such proclamation was ever issued.
It is true, that the President, as Commander-in-chief of the army and navy of the United States, did, on the first day of January, 1868, as a war measure, and for the suppression of the then existing rebellion against the authority of the Government of the United States, issue a proclamation, by which he declared that all persons held as slaves in certain designated States and parts of States, should thenceforward be free. But Tennessee was not one of the designated States, nor was any part thereof designated. Therefore, the status of persons held as slaves in the State of Tennessee, was not changed; nor were the rights of parties in refer *587 ence to this species of property in Tennessee affected, or proposed to be affeeted, by this proclamation. It had no reference whatever to either.
Then, it cannot he said that the emancipation of the slaves in Tennessee, by an amendment of the constitution of the State, adopted and ratified by the people of the State on the 22d of February, 1865, was either a ratification of the proclamation of the President, or “putting the seal to the deed.” For, as we have before shown, the proclamation did not offer freedom to the person held as a slave in Tennessee; consequently, no ratification of that proclamation could have given freedom to any such person. There was, then, no deed of emancipation of the slaves in Tennessee, to which a seal could he attached.
The amendment of the constitution of the State, ratified on the 22d of February, 1865, is itself the deed of emancipation, by which the bonds of slavery were dissolved, and that class of persons held as slaves in Tennessee were emancipated.
It is argued, and perhaps to some extent, his Hon- or, the Circuit Judge, recognized the correctness of the proposition, that, inasmuch, as during the stormy struggle through which we have recently passed, in many instances, masters were unable to control their slaves, who assumed to be free, and have been since emancipated ; therefore, they were, in legal contemplation, free, in fact, from the time their masters lost the control of them; and from that time henceforward, the owner no longer had any right of property in the slave. We cannot assent to the correctness of this proposi *588 tion. Now, bad tbe contest been between freedom upon tbe one band, and slavery upon tbe other, and freedom bad triumphed, then, perhaps, tbe principle contended for would have applied, and he, who was once a slave, would now be held as having been free from tbe beginning of tbe struggle, or from tbe time at which be declared himself a freeman.
But such was not tbe issue. Tbe struggle was an effort on tbe part of a portion of tbe people of tbe United States, upon tbe one band, to throw off their allegiance to tbe Government, and to establish, within tbe territory of tbe United States, a separate and independent government; while, upon tbe part of tbe Government, upon tbe other band, it was an effort to suppress this insurrection, and thus to maintain its authority over tbe territory of tbe United States. Thus tbe issue was formed upon which many bloody battles were fought. Tbe Government triumphed in the overthrow óf tbe rebellion, and the successful maintenance of its authority; and, as an incident to tbe struggle, slavery perished amid tbe expiring throes of tbe rebellion.
The facts disclosed in tbe record, as existing during tbe year 1864, and up to the 22d of February, 1865, certainly tended to impair tbe value of this woman and her child, as slaves — to weaken the tenure by which they were held as such, and clearly indicated their early emancipation; but they as certainly did not destroy tbe rights of tbe plaintiff, or give actual freedom to tbe slaves.
We have shown, as we think, that tbe legal status *589 of the woman, Ellen, and her son, Charles, was not changed by the proclamation of the President, or by either of the Acts of Congress referred to. But it is urged, they were free in 1864, upon principles of international law. If this had been so; if slavery had already been abolished by the occupation of the slave States by the military forces of the United States, and the slave had become a freeman by the events of the war, why, we would ask, was it deemed necessary after-wards to engraft amendments upon our Constitutions, both State and Federal, abolishing slavery and securing freedom to the slave? If the proposition contended for be true, the constitutional amendments referred to were but a work of supererogation; but to our minds, they furnish a conclusive answer to the argument that the Government, State or National, regarded emancipation as accomplished without them.
We do not think the principles of international law, as applied in times of a public war between two sovereign belligerent powers, have any application to this case, or in any manner affect the rights of the parties.
Again, it is insisted the plaintiff is not entitled to recover, because, if the defendant had paid plaintiff the hire, the military authority would have compelled him to pay the negro also.
Whether they would have done so or not, is a matter of conjecture only. There is nothing in the record showing any action or interference whatever upon the part of the military authorities in reference to questions of this character, in this or any other case. Upon this question the Court instructed the jury, in sub *590 stance, that if the plaintiff could not protect the defendant by his receipt, then the plaintiff could not recover, and then adds: “Both alike must be left to the consequences over which neither has any control.”
Now, we have assumed that under the law as it existed prior to the rebellion, there could be no question as to the plaintiff’s right to recover, and have sought in vain to ascertain if the law had been changed or abrogated; and, if so, when or how the same had been done; certainly it has not been done by statute, and it is not pretended in argument that the municipal law of the State upon this subject had been suspended, altered or abrogated by the order of the occupying military power, and we are not advised of any such order; consequently it continued in force, and to take its usual course. Then, by operation of the municipal law, the owner of the slave, or his personal representative, was entitled to receive the hire, and a payment to the slave would not have discharged the liability; and if, after the defendant had paid the plaintiff, persons engaged in the military service' had compelled him to pay the woman also, such compulsion would have been unauthorized; and the mere fact that the defendant apprehended he might thus be compelled to pay the woman also, after he had paid the plaintiff, could not operate to discharge him from his liability to the plaintiff; and he has no right to call upon the plaintiff to indemnify •him against the unauthorized acts of any one, whether in the military service or not; neither was the plaintiff under any obligation to give' such indemnity. The defendant voluntarily placed himself in the attitude of *591 a hirer; he received the services of the slaves, and the law raises the presumption that he promised to pay so ■much as the same were reasonably worth.
The fact that many slaves took refuge inside the Federal lines at Clarksville; did as they pleased; hired themselves to whomsoever they pleased, and received the hire without the voluntary consent of the owners; and the additional fact, that many of the citizens of Clarksville were forced either to hire such negroes or do without servants, cannot operate to defeat the rights of the owners. Neither can the fact, that it was the common practice of the citizens of Clarksville to hire any negro they wanted to, who would consent to live with them, operate to change the general laws of the land. It is also argued, that to hold the defendant liable in this case, would encourage the bringing of a multiplicity of law suits, and therefore the plaintiff is not entitled to recover. We do not know how the fact may be, but if it be as assumed, such a result may well be regretted; and upon grounds of public policy, ought to be avoided by the Courts of the country, when it can be done without violating the principles of justice and disregarding well recognized rules of law. But in our investigations, when we find that ita lex scripta est, it is our duty to declare it; the result is beyond our control. The law-making power belongs to another department of the Government, and not to the Courts.
The judgment will be reversed, and the cause remanded.